# EXHIBIT A

4826-4116-9732

1 | **KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)

2 | 1801 Century Park East, Suite 2300
Los Angeles, CA 90067

3 | Telephone: (310) 552-2250
Fax: (310) 552-7973

4 |

5 | Attorney for Plaintiffs,
DARICE A. WIRTH and

6 | EDWARD A. WIRTH

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FEB 0 2 2018

K. Boldis

7 |

8 | SUPERIOR COURT OF CALIFORNIA

9 | COUNTY OF RIVERSIDE

10 |

11 | DARICE A. WIRTH and
EDWARD A. WIRTH,

12 |

13 | Plaintiffs,

14 |

15 | vs.

16 |

17 |

18 | FORD MOTOR COMPANY, a Delaware
Corporation; FIESTA FORD, INC., a

19 | California Corporation, dba FIESTA
FORD; and DOES 1 through 10, inclusive,

20 |

21 |

22 | Defendants.

23 |

24 |

25 |

26 |

27 |

28 |

Case No.: **PSC 1800668**

Unlimited Jurisdiction

**COMPLAINT FOR:**

1. BREACH OF EXPRESS WARRANTY – VIOLATION OF SONG-BEVERLY ACT
2. BREACH OF IMPLIED WARRANTY – VIOLATION OF SONG-BEVERLY ACT
3. FRAUDULENT INDUCEMENT – CONCEALMENT
4. FRAUDULENT INDUCEMENT – INTENTIONAL MISREPRESENTATION
5. FRADULENT INDUCEMENT – NEGLIGENT MISREPRESENTATION
6. NEGLIGENT REPAIR

*Assigned for All Purposes to the Honorable*

Department

-1-

Wirth v. Ford - COMPLAINT

Plaintiffs, DARICE A. WIRTH and EDWARD A. WIRTH, allege as follows against Defendants, FORD MOTOR COMPANY, a Delaware Corporation (hereinafter "Ford"); FIESTA FORD, INC., a California Corporation, dba FIESTA FORD (hereinafter "FIESTA FORD"); and DOES 1 through 10 inclusive, on information and belief, formed after an inquiry reasonable under the circumstances:

## DEMAND FOR JURY TRIAL

1.      Plaintiffs, DARICE A. WIRTH and EDWARD A. WIRTH, hereby demand trial by jury in this action.

## GENERAL ALLEGATIONS

2.      Plaintiffs DARICE A. WIRTH and EDWARD A. WIRTH are individuals residing in the City of Hermosa Beach, County of Los Angeles, and State of California.

3.      Defendant Ford Motor Company is and was a Delaware Corporation registered to do business in the State of California with its registered office in the City of Los Angeles, County of Los Angeles, and State of California.

4.      Defendant Fiesta Ford is and at all relevant times was a California Corporation registered to do business in the State of California, with its principal place of business in the City of Indio, County of Riverside, and State of California, and its registered agent for service of process in the City of Indian Wells, County of Riverside, and State of California.

5.      This cause of action arises out of the warranty obligations of Ford Motor Company for a vehicle purchased by Plaintiffs and for which Ford Motor Company issued a written warranty. Plaintiffs also allege that Ford concealed a known defect from Plaintiffs. The defective component is called the DPS6 PowerShift Transmission (Hereinafter "PowerShift Transmission").   The PowerShift Transmission is an "automated manual" transmission used by Ford in their 2011-2013 Ford Fiesta vehicles and 2012-2014 Ford Focus vehicles. Ford also misrepresented to Plaintiffs the type of transmission the PowerShift transmission is/was.

6.      Plaintiffs do not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive,

-2-

Wirth v. Ford - COMPLAINT

1  under the provisions of section 474 of the California Code of Civil Procedure.  Defendant Does 1
2  through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set
3  forth herein, and are legally liable to Plaintiffs.  Plaintiffs will seek leave to amend this Complaint
4  to set forth the true names and capacities of the fictitiously named Defendant, together with
5  appropriate charging allegations, when ascertained.

6      7.    All acts of corporate employees as alleged were authorized or ratified by an officer,
7  director or managing agent of the corporate employer.

8      8.    Each Defendant whether actually or fictitiously named herein, was the principal, agent
9  (actual or ostensible), or employee of each other Defendant and in acting as such principal or
10  within the course and scope of such employment or agency, took some part in the acts and
11  omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the
12  relief prayed for herein.

13      9.    On February 15, 2014, Plaintiffs leased a new 2014 Ford Fiesta, VIN:
14  3FADP4EJ0EM203843, (hereinafter "the Vehicle" or "Subject Vehicle"), and express warranties
15  accompanied the sale of the vehicle to Plaintiffs by which Ford Motor Company undertook to
16  preserve or maintain the utility or performance of Plaintiffs' vehicle or provide compensation if
17  there was a failure in such utility or performance. The lease agreement is attached and incorporated
18  by its reference as Exhibit 1.

19      10.    The vehicle was delivered to Plaintiffs with serious defects and nonconformities to
20  warranty and developed other serious defects and nonconformities to warranty including, but not
21  limited to, transmission issues.

22      11.    Plaintiffs hereby revoke acceptance of the lease agreement.

23      12.    Plaintiffs hereby demand trial by jury in this action.

24      **The DPS6 PowerShift Transmission Defect**

25      13.    The Vehicle was manufactured by Ford and delivered to Plaintiffs with a PowerShift
26  Transmission.  Ford offered the PowerShift Transmission as the sole "automatic transmission"
27  option in the Subject Vehicle.

28  ///

-3-
Wirth v. Ford - COMPLAINT

14.     The PowerShift Transmission is neither a traditional manual transmission, nor a typical automatic transmission, but is a computerized "automated manual" transmission.

15.     Traditional manual transmissions use a driver-controlled clutch.  By pressing and releasing a foot pedal, the driver causes the clutch to mechanically engage and disengage the engine from the transmission, allowing the vehicle to travel continuously while the driver manually changes gears. Because a clutch allows for transfer of virtually all of the engine's power to the transmission, a properly designed and operating manual transmission is highly efficient. However, operation of a manual transmission can be difficult for less experienced drivers, and can result in the vehicle jerking or shuddering during improper operation, manual transmissions are disfavored by some consumers.

16.     In contrast, typical automatic transmissions free the driver from operating the clutch through the use of a fluid-filled device called a torque converter.  The torque converter substitutes for the manual transmission's clutch, transmitting power from the engine to the transmission through a fluid medium.

17.     While automatic transmissions offer increased comfort and convenience, they are generally less fuel efficient and slower-shifting than manual transmissions because the torque converter transfers power through fluid less efficiently than a mechanical clutch.

18.     Ford marketed and sold its PowerShift Transmission as an automatic transmission that offered the "best of both worlds" combining a manual transmission's fuel economy with an automatic transmission's ease of operation and shift quality.

19.     Ford's PowerShift Transmission, while sometimes referred to as an automatic, is actually a set of computerized manual transmissions.  It lacks a torque converter, instead using two clutches to mechanically engage and disengage the engine and transmission.  Whereas similar "automated manual" transmissions on the market use "wet" clutches bathed in oil, Ford's PowerShift Transmission clutches lack the oil pumps and other components of a wet clutch system, and instead operate "dry."

20.     Ford designed the PowerShift Transmission in an effort to meet heightened governmental and consumer expectations for fuel economy, performance, convenience, and

-4-

Wirth v. Ford - COMPLAINT

1  efficiency.  Ford designed and marketed its PowerShift Transmission as a more advanced and fuel

2  efficient automatic transmission.   According to Ford's press release dated March 10, 2010,

3  "PowerShift with dry-clutch facings and new energy-saving electromechanical actuation for

4  clutches and gear shifts saves weight, improves efficiency, increases smoothness, adds durability

5  and is sealed with low-friction gear lubricant for the life of the vehicle.  The transmission requires

6  no regular maintenance."

7      21.    In theory, a computer-controlled, automated manual transmission may provide the

8  convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of

9  a manual transmission.   In practice, however, Ford's PowerShift Transmission is plagued by

10 numerous problems and safety concerns.

11     22.    Plaintiffs are informed and believe, and based thereon allege, that the PowerShift

12 Transmission is defective in its design and/or manufacture in that, among other problems, the

13 transmission consistently slips, bucks, kicks, jerks, harshly engages, has premature internal wear,

14 sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and,

15 eventually, premature transmission failure (the "Transmission Defect").

16     23.    The Transmission Defect causes unsafe conditions in vehicles equipped with the

17 PowerShift Transmission, including, but not limited to suddenly lurching forward, delayed

18 acceleration, and sudden loss of forward propulsion.   These conditions present a safety hazard

19 because they severely affect the driver's ability to control the car's speed, acceleration, and

20 deceleration.  For example, these conditions make it difficult to safely merge into traffic.  Even

21 more troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate,

22 but instead continue to transfer power to the transmission and even surge the engine's RPMs, when

23 the brakes are depressed.    As a result, drivers of vehicles equipped with the PowerShift

24 Transmission have reported their vehicles lurching forward into intersections at red lights due to

25 the failure of their braking efforts to stop the car.

26     24.    On information and belief, the Transmission Defect also causes premature wear to the

27 PowerShift Transmission's clutch plates and other components, which results in premature

28 transmission failure and requires expensive repairs, including premature transmission replacement.

25.     As early as 2010, Ford knew or should have known that the PowerShift Transmission contained one or more design and/or manufacturing defects that negatively affect drivability and cause safety hazards.

26.     Plaintiffs are informed and believe, and based thereon allege, that prior to sale of the Vehicle, Ford knew, or should have known, about the Transmission Defect through its exclusive knowledge of non-public, internal data about the Transmission Defect, including: pre-releasing testing data; early consumer complaints about the Transmission Defect to Ford's dealers who are Ford's agents for vehicle repairs; dealership repair orders; testing conducted in response to those complaints; technical service bulletins ("TSBs") developed by Ford and communicated to its dealers and authorized repair facilities; the existence of substantially identical defects in substantially identical European and Australian model vehicles released prior to Ford's marketing and sale of the PowerShift Transmission domestically; and other internal sources of information possessed exclusively by Ford and its agents.   Nevertheless, Ford and its agents have actively concealed the Transmission Defect, and failed to disclose this defect to Plaintiffs at the time of purchase of the Vehicle or thereafter.

27.     Before offering vehicles equipped with the PowerShift Transmission (which Ford internally refers to as the "DPS6 automatic transmission") in the United States, Ford offered substantially identical vehicles, equipped with a similar dual-clutch transmission, in Europe and Australia.   Although the domestic version of the transmission utilizes dry clutches as opposed to the European and Australian version's wet clutches, Ford acknowledges that the transmission offered for sale in the United States is "derivative" of the design from the European and Australian models.   European and Australian versions of the dual-clutch transmission suffered from similar defects known to Ford as alleged herein.

28.     In addition to obtaining years of feedback and testing from its European and Australian dual-clutch transmission, according to Ford, its team:

> "logged approximately three years or 6,000 man-hours of computer aided mathematical modeling, simulation and analysis of engine speeds, torque and clutch capacity in only 24 months real time to prove the THF concept was production ready."

-6-

Wirth v. Ford - COMPLAINT

29.   In addition, Ford boasted about its extensive testing of the vehicle in its marketing brochures that were publicly distributed:

> "Obsessive was the starting point.  You'll enjoy every drive because Focus engineers obsessed over every last detail.  Focus was thoroughly tested in an assortment of harsh environments and situations to make sure you get a car beyond your wildest imagination."

30.   The PowerShift Transmission uses a program called Torque Hole Filling ("THF"), which is a combination of computer algorithms and computer aided tools to fill the torque hole, or what is more commonly perceived as a hesitation, while shifting.  Ford claimed its THF technology would create a smoother driving experience for the customer to promote sales.

31.   Despite these claims, consumers have not experienced a smoother driving experience from THF or any other technology incorporated in the PowerShift Transmission.  Multiple reviews in automotive journals and customer complaints have documented and confirmed that the PowerShift transmission has continuously exhibited the defects, malfunctions, maladjustments, and nonconformities that the Plaintiffs now complain of.

32.   In a 2011 *New York Times* review of the Ford Focus, the reviewer stated that "Ford programmed the PowerShift Dual-clutch transmission to change gears in odd and infuriating ways" and that "[t]he transmission is often in the wrong gear at the wrong time, resulting in jerks, pauses and lethargic acceleration."

33.   In response to these criticisms, Greg Burgess, an engineer at Ford, conceded in the same *New York Times* article that "[i]t is quite a challenge to deliver something that is very, very fuel efficient and yet feels like a conventional automatic, and there are some balances and some trade-offs that we make."

34.   In response to complaints about the Transmission Defect, in 2010 and 2011, Ford issued several Technical Service Bulletins ("TSBs") to its dealers and authorized repair facilities acknowledging defects in the PowerShift Transmission.  Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informed dealers and service personnel of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive

1  or Reverse, grinding noise during engagement, and/or check engine light with transmission control

2  module (CM) diagnostic trouble code…"

3      35.    Similarly, Ford's TSB released on January 1, 2011, covering the 2011 Ford Fiesta with

4  the PowerShift Transmission, informs dealers and service personnel of problems with the

5  PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response

6  while driving."

7      36.    Ford's TSB from March 31, 2011 also covering the 2011 Ford Fiesta, informs dealers

8  of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

9      37.    Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta.  These

10  TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or

11  Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement,

12  intermittent engagement, noise during engagement…"

13      38.    Another Ford TSB released in September 2011 advised dealers to reprogram the

14  transmission computer if 2011 Ford Fiesta owners complained about "hesitation when accelerating

15  from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in

16  or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

17      39.    The 2012 Ford Focus was the subject of a September 2011 Ford TSB, which informed

18  dealers and service personnel of transmission problems including: "RPM flare on deceleration

19  coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations

20  at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

21      40.    In May of 2012, Ford issued a "Customer Satisfaction Program: Program Number

22  12B37." In a letter sent to 2012 Ford Focus drivers, Ford indicated that drivers "may experience

23  rough or jerky automatic transmission shifts.  In addition, the vehicle may experience roll back

24  when the driver is transitioning from the brake pedal to the accelerator pedal while on a slight

25  incline."  Significantly, Ford did not issue a recall and did not warn drivers of the safety risks

26  associated with these known problems.

27      41.    Because Ford will not notify the public that the transmission is defective, Plaintiffs (as

28  well as members of the general public) are subjected to dangerous driving conditions that often

1    occur without warning.

2        42.    Ford knew about, and concealed, the Transmission Defect present in the Vehicle, along

3    with the Transmission Defect's attendant dangerous safety and drivability problems, from

4    Plaintiffs at the time of sale, repair, and thereafter. In fact, instead of repairing the defects in the

5    PowerShift Transmission, Ford either refused to acknowledge their existence, or performed

6    superficial and ineffectual software upgrades that simply masked the symptoms of the

7    Transmission Defect.

8        43.    If Plaintiffs knew about these defects at the time of sale, Plaintiffs would not have

9    purchased the Vehicle or would have paid substantially less for it.

10       44.    As a result of Plaintiffs' reliance on Ford and its agent's omissions and/or

11   misrepresentations, Plaintiffs suffered an ascertainable loss of money, property, and value to the

12   Vehicle. Additionally, as a result of the Transmission Defect, Plaintiffs were harmed and suffered

13   actual damages in that the Vehicle's transmission is substantially certain to fail before its expected

14   useful life has run.

15                    **Ford Had Exclusive Knowledge of the Transmission Defect**

16       45.    Ford had superior and exclusive knowledge of the Transmission Defect, and knew

17   or should have known that the Transmission Defect was not known or reasonably discoverable by

18   Plaintiffs, before Plaintiffs purchased the Vehicle.

19       46.    Plaintiffs are informed and believe and based thereon allege that before Plaintiffs

20   purchased the Vehicle, and since at least 2010, Ford knew about the Transmission Defect through

21   sources not available to consumers, including pre-release testing data, early consumer complaints

22   about the transmission defects to Ford and its dealers, testing conducted in response to those

23   complaints, high failure rates and replacement part sales data, aggregate data from Ford dealers,

24   among other internal sources of aggregate information about the problem including, but not limited

25   to, similar defects in the substantially identical European and Australian models.

26       47.    Before the Vehicle was available for sale in the United States, Ford offered the same

27   vehicles, equipped with a similar dual-clutch transmission, in Europe and Australia. Although the

28   United States version utilizes dry-clutches as opposed to the European and Australian version's

1   wet-clutches, Ford acknowledged in its own press release that the transmission offered for sale in

2   the United States is a "derivative" of the design of the European and Australian models. European

3   and Australian versions of the dual-clutch transmission suffered from similar defects as alleged

4   herein.

5       48.     In addition to having access to years of analysis and feedback concerning the prior

6   dual-clutch design, Ford also acknowledged in its own press releases the extensive pre-release

7   testing and computer aided modeling, simulation, and analysis it conducted before bringing the

8   PowerShift Transmission to the United States market.

9       49.     Ford was also aware of the Transmission Defect through the numerous complaints it

10   received, both from consumers and from automotive journalists, who roundly criticized the

11   performance of the PowerShift Transmission. Indeed, a July 15, 2011 *New York Times* review of

12   the Ford Focus criticized the PowerShift transmission's "jerks, pauses and lethargic acceleration."

13   In that same article, Greg Burgess, a Ford engineer, admitted that Ford made "tradeoffs" in terms

14   of drivability in order to "deliver something that is very, very fuel efficient."

15      50.     The review went on to state: "the logical explanation is that they [the Ford Engineers]

16   were given a fuel economy target and no option but to meet it. One might wonder why a top

17   executive didn't step in to keep the transmission from reaching market."

18      51.     The existence of the Transmission Defect is a material fact that a reasonable consumer

19   would consider when deciding whether to purchase or lease a vehicle equipped with a PowerShift

20   Transmission. Had Plaintiffs known that the Vehicle was equipped with a defective transmission,

21   they would not have purchased the Vehicle equipped with the PowerShift Transmission or would

22   have paid substantially less for it.

23      52.     Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's transmission

24   is safe, will function in a manner that will not pose a safety hazard, and is free from defects.

25   Plaintiffs further reasonably expect that Ford will not sell or lease vehicles with known safety

26   defects, such as the Transmission Defect, and will disclose any such defects to its consumers when

27   it learns of them. They did not expect Ford to fail to disclose the Transmission Defect to them and

28   to continually deny the defect.

**Ford's Failure to Disclose the PowerShift Transmission Defect**

53.     Ford has never disclosed the PowerShift Transmission defect to Plaintiffs prior to the purchase of the Subject Vehicle or at any point during ownership of the Subject Vehicle, and Ford has never instructed its dealerships to disclose the PowerShift Transmission defect to drivers or potential purchasers or lessees of vehicles equipped with the PowerShift Transmission.

54.     The PowerShift Transmission defect was not known or reasonably discoverable by the Plaintiffs before purchase or lease, or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

55.     Ford has remained silent even as it issued service bulletins, conducted internal investigations, and witnessed the failure of the transmission in earlier models of their vehicles distributed in Europe and Australia.

56.     Ford's refusal to publically acknowledge the defect has created widespread confusion. Ford's failure to notify consumers, dealerships, or auto-technicians prevents the PowerShift Transmission problem from being efficiently diagnosed. Drivers are led to believe that the problems they are experiencing with the transmission in their vehicle are actually "normal characteristics" of the transmission. Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be able to diagnose and fix the PowerShift Transmission defect, or advise Plaintiffs about the dangers of driving the Subject Vehicle.

57.     As a result of Ford's inaction and silence, Plaintiffs were entirely unaware that Plaintiffs purchased, and continue to drive, an unsafe and unreliable vehicle. As Ford knows, a reasonable person would consider the PowerShift Transmission defect important and would not purchase or lease a vehicle equipped with the PowerShift Transmission defect were the defect disclosed in advance, or would pay substantially less for the vehicle.

**Ford Has Actively Concealed the Transmission Defect**

58.     While Ford has been fully aware of the Transmission Defect affecting the Vehicle, Ford and its agents actively concealed the existence and nature of the Transmission Defect from Plaintiffs at the time of purchase, repair, and thereafter.  Specifically, Ford failed to disclose or actively concealed, at and after the time of purchase or repair:

-11-

Wirth v. Ford - COMPLAINT

a. any and all known material defects or material nonconformity of the Vehicle, including the defects relating to the PowerShift Transmission;

b. that the Subject Vehicles, including their PowerShift Transmission, were not in good working order, were defective, and were not fit for the intended purposes; and

c. that Subject Vehicles and their PowerShift Transmission were defective, despite the fact that Ford learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2010.

59.     As a result of the Transmission Defect, Ford was inundated with complaints regarding the PowerShift Transmission.   In July 2011, Ford implemented a communications strategy intended to enlighten consumers about some of the behavior characteristics of the PowerShift Transmission in order to "improve customer expectations."  In a memo with instructions sent to Ford dealers and service personnel, which Ford intended its dealers and service personnel to communicate to consumers, Ford noted that some of the common and normal characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine.

60.     However, despite Ford's public insistence that these behavioral characteristics of the PowerShift Transmission were normal, in 2010 and 2011, Ford issued several TSBs to its dealers in the United States acknowledging defects in the PowerShift Transmission.  Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informs dealers how to address and attempt to repair the PowerShift Transmission in response to "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code..."

61.     Ford's TSB released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

62.     Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

-12-

Wirth v. Ford - COMPLAINT

63.     Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta.   These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement…"

64.     On information and belief, another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

65.     The 2012 Ford Focus was the subject of a Ford TSB in September 2011, which informed dealers of transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

66.     In December of 2011, *Motor Trend* magazine called these efforts by Ford a "stealth upgrade" and noted that while "[t]here's no official recall or service campaign… anybody who complains or requests an upgrade at the dealership can have their powertrain control computer re-flashed."

67.     On information and belief, the software upgrades recommended and encouraged by the various TSBs issued by Ford were completely ineffective at addressing the Transmission Defect.

68.     When consumers present vehicles equipped with the PowerShift Transmission to an authorized Ford dealer for repair to the transmission, rather than inform consumers of the Transmission Defect or conclusively repair the problem under warranty, Ford's dealers and authorized repair facilities either inform consumers that their vehicles are functioning properly, or perform superficial and ineffectual software updates that delay or mask the manifestation of the Transmission Defect in an attempt to avoid more comprehensive and expensive repairs or replacements under the warranty.

69.     To this day, Ford still has not notified Plaintiffs that the Vehicle suffers from a systemic defect that causes the transmission to malfunction.

-13-

Wirth v. Ford - COMPLAINT

**PLAINTIFFS' EXPERIENCES**

70.    The Vehicle was equipped with a DPS6 Ford PowerShift Transmission.

71.    On or about February 15, 2014, Plaintiffs visited Fiesta Ford, Inc. in Indio, California in hopes of leasing a new Ford Fiesta vehicle. Plaintiffs walked the dealership in search of a vehicle to meet Plaintiffs' needs, assisted by a salesperson. Plaintiffs were specifically searching for a Ford Fiesta vehicle with an automatic transmission for a smoother and more effortless drive. In searching the car inventory on the car lot, Plaintiffs reviewed the window stickers of multiple Ford Fiesta vehicles that caught their eye.  The window stickers on these vehicles identified them as having an automatic transmission. Plaintiffs identified a 2014 Ford Fiesta they were interested in leasing. Plaintiffs' conversations with the salesperson, the window sticker on the vehicle, and a test drive of the vehicle all reinforced Plaintiffs' belief that the Vehicle was in fact equipped with an automatic transmission.  The salesperson never disclosed to Plaintiffs that the vehicle was not actually equipped with an automatic transmission.  Plaintiffs relied on the statements on the window sticker and marketing materials they had received about the Ford Fiesta.

72.    Prior to leasing the Vehicle, Plaintiffs reviewed marketing brochures, viewed television commercials and/or heard radio commercials about the qualities of the Ford Fiesta. Plaintiffs also relied on Ford's reputation as an established and experienced auto manufacturer. Plaintiffs further relied on the statements made during the sales process by Ford's agents and within the marketing brochures provided by Ford. However, Ford and its authorized agents did not publicly or privately disclose to Plaintiffs any information about the Transmission Defect. These omissions were material to Plaintiffs' decision to lease the Vehicle. Had Ford and/or its authorized agents publicly or privately disclosed the Transmission Defect before Plaintiffs leased the Vehicle, Plaintiffs would have been aware of such disclosures, and would not have leased the Vehicle.

73.    On or around October 10, 2014, Plaintiffs delivered the Vehicle to Fiesta Ford, an authorized Ford repair facility for repair. Plaintiff complained of the engine surging during freeway operation and RPM fluctuating.  The Vehicle was then returned to Plaintiffs, and the service technician represented to Plaintiffs that the Vehicle was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility.

-14-

Wirth v. Ford - COMPLAINT

74.     On or around October 8, 2015, Plaintiffs again delivered the Vehicle to Fiesta Ford, an authorized Ford repair facility for repair with complaints of the Vehicle shuddering on acceleration and surging. The repair facility technicians updated the transmission control module ("TCM") and powertrain control module ("PCM"), and performed adaptive learning, ordered a clutch and seal kit and performed recall #15B22 TCM reprogramming for overt TCM failure warning. When the Vehicle was returned to Plaintiffs, the service technician represented to Plaintiffs that the Vehicle had been repaired and was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

75.     On or around November 13, 2015, Plaintiffs once again delivered the Vehicle to Fiesta Ford, an authorized Ford repair facility for repair. Plaintiffs again complained of the Vehicle shuddering at take-off. The repair facility technicians replaced the clutch assembly and both input shaft seals. The Vehicle was returned to Plaintiffs and the service technician represented to Plaintiffs that the Vehicle was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

### All Statute of Limitations Periods are Tolled by the Discovery Rule and the Doctrine of Fraudulent Concealment

76.     Ford misrepresented the qualities of the transmission in the Vehicle to Plaintiffs at the time of the sale of the vehicle. Ford also concealed the fact that the transmission was defective.

77.     Ford continued to misrepresent its ability to repair the vehicle in conformity with the warranty throughout the warranty period.

78.     At all relevant times, Ford was aware of the defects in the Powershift transmission.

79.     As described in more detail above, as early as 2010, Ford began issuing significant technical service bulletins to its authorized dealers explaining the widespread issues with the Powershift transmission. At no point prior to the sale of the vehicle to Plaintiffs or during Plaintiffs' ownership of the Vehicle did Ford or an authorized dealer ever inform Plaintiffs of the ongoing defect or the fact that Plaintiffs' Vehicle was not actually equipped with an automatic

-15-

Wirth v. Ford - COMPLAINT

transmission.

80. Ford had a duty to disclose the concealed facts alleged above because Ford knew that Plaintiffs did not know a material fact and further knew that such facts were not readily accessible to the Plaintiffs because Ford actively concealed those facts.

81. Ford had a duty to disclose the concealed facts alleged above because Ford made misrepresentations in its marketing materials and window stickers and through its authorized sales representatives about the quality, characteristics, and safety of the Powershift transmission.

82. Ford had a duty to disclose the concealed facts alleged above because Ford actively concealed material facts in order to induce a false belief.

83. Ford intended for Plaintiffs to rely on those misrepresentations to conceal the fact that the defective Powershift Transmission could not be repaired.

84. Prior to the sale of the Vehicle, and at all times thereafter, Defendant therefore failed to disclose the existence of the vehicle's inherent defects to Plaintiffs, and Defendant failed to disclose its inability to repair these inherent defects, which prevented the Vehicle from conforming to its applicable warranties. In effect, after the sale of the Vehicle, Defendant fraudulently concealed from purchasers, including Plaintiffs, the fact that the dealers were not properly repairing the defects to the Powershift transmission, and knew that the limited work that Ford had authorized its dealerships to perform on those vehicles would not properly repair them. Ford also continued to conceal the fact that Plaintiffs' vehicle was not in fact equipped with an automatic transmission as advertised.

85. On July 7, 2017, Defendant mailed Plaintiffs class notice as a putative class member in the class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx). Plaintiffs received this notice shortly thereafter. This date was the earliest date that Plaintiffs could have had any sort of notice of the facts which give rise to Plaintiffs' fraud causes of action. Ford did not disclose any of this information prior to the sale of the vehicle to Plaintiffs or at any earlier date during ownership. Accordingly, Plaintiffs could not have discovered their claims prior to July 7, 2017. Plaintiffs could not, despite reasonable and diligent investigation, have discovered such on an earlier date because of Ford's

-16-

Wirth v. Ford - COMPLAINT

1   fraudulent misrepresentations and concealment of the defects in the PowerShift transmission in

2   Plaintiffs' vehicle, as previously alleged above. Additionally, the repeated false assurances of Ford

3   and its service dealership agents made to Plaintiffs, on which Plaintiffs reasonably relied, that Ford

4   had and would repair any problems with the transmission in Plaintiffs' vehicle that occurred during

5   the express warranty period and that said problems would not be repeating further delayed

6   Plaintiffs' discovery of their claims. The statute of limitations for each of Plaintiffs' claims against

7   Ford was therefore tolled under the delayed discovery rule and the doctrine of fraudulent

8   concealment until Plaintiffs could have first discovered on or around July 7, 2017 that Ford had

9   misrepresented the characteristics of the transmission and concealed the known defects during the

10   ownership of the Vehicle.

11       86.     Because Ford failed to disclose these foregoing facts to Plaintiffs, all statute of

12   limitations periods with respect to sale of the Vehicle were tolled by the doctrines of fraudulent

13   concealment, the discovery rule, and/or equitable tolling. As alleged herein, Ford wrongfully

14   concealed the fact (1) that the Vehicle was equipped with a manual transmission (the PowerShift

15   transmission), and (2) that its dealerships were making inadequate repairs that were incapable of

16   addressing the root cause of the Vehicle's malfunctions.

17       87.     Plaintiffs did not discover the operative facts that are the basis of the claims alleged

18   herein because the facts were concealed in confidential and privileged documents, which a

19   consumer would not know about and could not obtain.

20       88.     No amount of diligence by Plaintiffs could have led to the discovery of these facts

21   because they were kept secret by Ford and, therefore, Plaintiffs were not at fault for failing to

22   discover these facts.

23       89.     Plaintiffs did not have actual knowledge of facts sufficient to put them on notice.

24   Plaintiffs did not know, nor could have known, about Ford's inability to repair the defects in its

25   PowerShift transmission because, as alleged above, Ford kept this information highly confidential,

26   and its dealership assured Plaintiffs that its repairs were effective.

27   ///

28   ///

**All Statute of Limitations Periods are Tolled by the Tolling Doctrine Established in *American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class Action *Vargas v. Ford Motor Company***

90.     Plaintiffs gave timely notice of Plaintiffs' claims against Ford in the present action as putative class members in a class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on September 28, 2012.  That action was filed within three years of the date of Plaintiffs' discovery of their claims against Ford in the present action, as previously described in detail above.

91.     There is no prejudice to Ford in gathering evidence to defend against Plaintiffs' individual claims because the class definition in the class action complaint within which Plaintiffs were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiffs' individual action, the witnesses necessary for Ford to defend Plaintiffs' individual action, and the causes of action against Ford asserted in Plaintiffs' individual action.

92.     *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts on behalf of Plaintiffs as putative class members as are being alleged by Plaintiffs in the present individual action.

93.     The facts alleged in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are substantially similar, if not identical to the facts alleged herein.

94.     The allegations in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based on the same subject matter and similar evidence as the instant complaint.  Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

95.     The *Vargas* class action certainly protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action.  Consumer class actions regarding defective vehicles brought against manufacturers

1    are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

2        96.    The tolling of Plaintiffs' individual statute of limitations encourages the protection of

3    efficiency and economy in litigation as promoted by the class action devise, so that putative class

4    members would not find it necessary to seek to intervene or to join individually because of fear the

5    class might never be certified or putative class members may subsequently seek to request

6    exclusion.

7        97.    The running of all statute of limitations on each of Plaintiffs' claims asserted against

8    Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire

9    pendency of the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed

10   on September 28, 2012 to the date on which Plaintiffs opted out of the *Vargas* class action

11   litigation, on or around August 30, 2017).

12

13       All Statute of Limitations Periods are Tolled Under California Law by the Doctrine of Equitable

14           Tolling As a Result of the Class Action *Vargas v. Ford Motor Company*

15       98.    Plaintiffs gave timely notice of Plaintiffs' claims against Ford in the present action as

16   putative class members in a class action, *Vargas v. Ford Motor Company*, United States District

17   Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on

18   September 28, 2012. That action was filed within three years of the date of Plaintiffs' discovery of

19   their claims against Ford in the present action, as previously described in detail above.

20       99.    There is no prejudice to Ford in gathering evidence to defend against Plaintiffs'

21   individual claims because the class definition in the class action complaint within which Plaintiffs

22   were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford Motor

23   Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388

24   ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiffs' individual action, the

25   witnesses necessary for Ford to defend Plaintiffs' individual action, and the causes of action

26   against Ford asserted in Plaintiffs' individual action.

27       100.   *Vargas v. Ford Motor Company*, United States District Court, Central District of

28   California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts on behalf of Plaintiffs

-19-

Wirth v. Ford - COMPLAINT

1    as putative class members as are being alleged by Plaintiffs in the present individual action.

2        101.    The facts alleged in *Vargas v. Ford Motor Company*, United States District Court,

3    Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are substantially similar, if

4    not identical to the facts alleged herein.

5        102.    The allegations in *Vargas v. Ford Motor Company*, United States District Court,

6    Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based on the same subject

7    matter and similar evidence as the instant complaint.   Those allegations concern the same

8    evidence, memories, and witnesses as the subject matter in the instant complaint.

9        103.    The *Vargas* class action certainly protected the efficiency and economy of litigation

10   because that class action is protecting the rights of thousands of consumers nationwide through a

11   single action.  Consumer class actions regarding defective vehicles brought against manufacturers

12   are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

13       104.    Plaintiffs acted reasonably and in good faith in filing the instant action.  Shortly after

14   discovering Ford's fraudulent behavior, Plaintiffs filed the instant action to pursue their individual

15   rights without delay.

16       105.    The tolling of Plaintiffs' individual statute of limitations encourages the protection of

17   efficiency and economy in litigation as promoted by the class action devise, so that putative class

18   members would not find it necessary to seek to intervene or to join individually because of fear the

19   class might never be certified or putative class members may subsequently seek to request

20   exclusion.

21       106.    The running of all statute of limitations on each of Plaintiffs' claims asserted against

22   Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire

23   pendency of the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed

24   on September 28, 2012 to the date on which Plaintiffs opted out of the *Vargas* class action

25   litigation, on or around August 30, 2017).

26   ///

27   ///

28   ///

-20-
Wirth v. Ford - COMPLAINT

**FIRST CAUSE OF ACTION**

**Violation of the Song-Beverly Act – Breach of Express Warranty**

**(Against Ford Only)**

107.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

108.   Express warranties accompanied the sale of the vehicle to Plaintiffs by which Ford undertook to preserve or maintain the utility or performance of Plaintiffs' vehicle or provide compensation if there was a failure in such utility or performance.

109.   The vehicle was delivered to Plaintiffs with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to a transmission.

110.   Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiffs have used the vehicle primarily for those purposes.

111.   Plaintiffs are a "buyer" of consumer goods under the Act.

112.   Defendant Ford is a "manufacturer" and/or "distributor" under the Act.

113.   The foregoing defects and nonconformities to warranty manifested themselves within the applicable express warranty period. The nonconformities substantially impair the use, value and/or safety of the vehicle.

114.   Plaintiffs delivered the vehicle to an authorized Ford repair facility for repair of the nonconformities.

115.   Defendant was unable to conform Plaintiffs' vehicle to the applicable express warranty after a reasonable number of repair attempts.

116.   Notwithstanding Plaintiffs' entitlement, Defendant Ford has failed to either promptly replace the new motor vehicle or promptly make restitution in accordance with the Song-Beverly Act.

117.   By failure of Defendant to remedy the defects as alleged above, or to issue a refund or replacement, Defendant is in breach of its obligations under the Song-Beverly Act.

118.   Under the Act, Plaintiffs are entitled to reimbursement of the price paid for the vehicle less that amount directly attributable to use by the Plaintiffs prior to discovery of the nonconformities.

119.   Plaintiffs are entitled to all incidental, consequential, and general damages resulting from Defendant's failure to comply with their obligations under the Song-Beverly Act.

120.   Plaintiffs are entitled under the Song-Beverly Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action.

121.   Plaintiffs are entitled in addition to the amounts recovered, a civil penalty of up to two times the amount of actual damages in that Ford, has willfully failed to comply with its responsibilities under the Act.

## SECOND CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Implied Warranty

### (Against Ford Only)

122.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

123.   Ford and its authorized dealership at which Plaintiffs purchased the Subject Vehicle had reason to know the purpose of the Subject Vehicle at the time of sale of the Subject Vehicle. The sale of the Subject Vehicle was accompanied by an implied warranty of fitness.

124.   The sale of the Subject Vehicle was accompanied by an implied warranty that the Subject Vehicle was merchantable pursuant to Civil Code section 1792.

125.   The Subject Vehicle was not of the same quality as those generally acceptable in the trade because it was equipped with a defective transmission.

126.   The Subject Vehicle was not fit for the ordinary purpose for which such goods are used because it was equipped with a defective transmission.

127.   The Subject Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with a defective transmission.

///

-22-

Wirth v. Ford - COMPLAINT

128.    The Subject Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with an automated manual transmission rather than the automatic transmission as labeled.

129.    Plaintiffs are entitled to justifiably revoke acceptance of the Subject Vehicle under Civil Code section 1794, *et seq*; Plaintiffs hereby revoke acceptance of the Subject Vehicle.

130.    Plaintiffs are entitled to replacement or reimbursement pursuant to Civil Code section 1794, *et seq*.

131.    Plaintiffs are entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq*. and Commercial Code section 2711.

132.    Plaintiffs are entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code section 1794, *et seq*.

133.    Plaintiffs are entitled to recover all incidental and consequential damages pursuant to 1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq*.

### THIRD CAUSE OF ACTION

#### Fraudulent Inducement – Concealment

#### (Against Ford Only)

134.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

135. Ford and its agents intentionally concealed and failed to disclose facts relating to the Transmission Defects as explained in detail in paragraphs 13-69.

136.    Defendant was the only party with knowledge of the Transmission Defects because that knowledge came from internal reports such as pre-release testing data, customer complaints made directly to Defendant, and technical service bulletins.  None of this information was available to the public, nor did Defendant publicly or privately disclose any of the information to Plaintiffs. Ford had exclusive knowledge of the defect as described in detail in paragraphs 45-52.

137. Ford actively concealed information from the public, preventing Plaintiffs from discovering any of the concealed facts as described in detail in paragraphs 53-69.

///

-23-

Wirth v. Ford - COMPLAINT

138.   Prior to the date of sale, on the date of sale, and on the date of each of the repair attempts, Defendant had an opportunity to disclose to Plaintiffs, but instead concealed from and failed to disclose to Plaintiffs, any of the known irreparable issues with the Vehicle.

139. Ford intended to deceive Plaintiffs by concealing the known issues with the PowerShift Transmission, including the Transmission Defect, in an effort to sell the Vehicle at a maximum price.

140. Ford knew of the specific transmission issues affecting the Vehicle, including the Transmission Defect, prior to the sale of the Vehicle.  For example, in 2010, Ford released a TSB after months of research relating to "concerns such as no engage or intermittent no engage in Drive or Reverse when shifting from Park to Drive or Reverse" for certain vehicles equipped with the PowerShift Transmission.  Plaintiffs vehicle was sold after Ford acknowledged these problems in a TSB without any sort of disclosure being made to the Plaintiffs.   When Plaintiffs experienced repeated problems with the shifting of the transmission in the Vehicle, and at each time Plaintiffs brought the Vehicle to Ford's authorized repair facility for evaluation and repair, Ford and its agents continued to conceal the known Transmission Defect and repeatedly represented to Plaintiffs that it was able to fix the issue.

141.   Plaintiffs did not know about the Transmission Defects at the time of sale.  Plaintiffs also did not know of the irreparable nature of the problems at the time of any of the repair attempts because Ford and its agents repeatedly represented that it was able to fix the vehicle upon return of the Vehicle to Plaintiffs.

142.   Had Ford and/or its agents publicly or privately disclosed the Transmission Defect to Plaintiffs at or prior to the sale, Plaintiffs would not have purchased the Vehicle.

143.   Plaintiffs were harmed by Defendant's concealment of the Transmission Defect because Plaintiffs were induced to enter into the sale of a vehicle that Plaintiffs would not have otherwise purchased.

144.   Defendant's concealment of the defects was a substantial factor in causing Plaintiffs' harm.

///

-24-

Wirth v. Ford - COMPLAINT

## FOURTH CAUSE OF ACTION

### Fraudulent Inducement – Intentional Misrepresentation

### (Against Ford Only)

145.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

146.    Ford drafted, produced, and distributed marketing brochures to the public containing factual representations about the PowerShift Transmission.  Ford's marketing brochure for the Vehicle represented the PowerShift Transmission was a "6-speed automatic transmission."

147.    Unfortunately, the Vehicle as delivered to Plaintiffs had extremely poor handling on all roads, as Plaintiffs' drive was repeatedly interrupted by jerky shifts and hesitation.  Plaintiffs' Vehicle was also not equipped with an "automatic" transmission, contrary to Ford's suggestion that the transmission is a traditional "automatic."  Plaintiffs' Vehicle in fact contained an unproven automated dual clutch manual transmission.  Plaintiffs' Vehicle did not have seamless gear changes – it experienced jerky gear changes and hesitation between shifts, which necessitated several repairs and repeated reprogramming of the transmission control module – none of which were sufficient to resolve the Transmission Defect.

148.    Ford made such representations regarding PowerShift Transmission in the 2014 Ford Fiesta despite its extensive internal knowledge of the Transmission Defect and other problems. Ford's knowledge of the Transmission Defect is laid out in detail in paragraphs 45-52.

149.    Ford informed its dealers and authorized service facilities and personnel, about common behavior characteristics of the PowerShift Transmission in July 2011.  In a memo with instructions sent to Ford dealers and authorized service personnel, Ford noted that some of the common characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine.  Despite this admission by Ford to its dealers, repair facilities, and agents, Ford continued to represent to the public that the PowerShift Transmission offered "great handling on all roads," and "the performance of a manual," and seamless gear changes for amazing responsiveness," a wildly different picture from

///

Wirth v. Ford - COMPLAINT

1  the reality.  Ford made the statements in its marketing brochures recklessly and without regard for

2  their truth.

3      150.    In addition, Ford misrepresented the type of transmission equipped in the Vehicle.

4  Throughout its marketing brochure, Ford states that the vehicle is equipped with a 6-speed

5  automatic transmission.  That representation is false.  The vehicle is actually equipped with the

6  Ford PowerShift Transmission, which is in fact a dual clutch transmission, which operates using

7  direct mechanical engagement and disengagement similar to a manual transmission.  This

8  information is material for a consumer to know in making a purchasing decision, because unlike a

9  traditional automatic transmission, Ford's PowerShift dual clutch transmission powers the drive

10  wheels through a clutch, rather than a torque converter.  The use of a clutch can result in a

11  substantially jerkier ride than that produced using a torque converter, particularly in an unproven

12  design.  Plaintiffs would not have purchased the Vehicle had Plaintiffs known the vehicle's

13  transmission technology would cause the

14  drive to be jerky, unreliable, and dangerous as a result of the unproven dual-clutch (rather than

15  automatic) system.

16      151.    Defendants intended that Plaintiffs rely on the representations made in the marketing

17  brochure related to the transmission in inducing Plaintiffs to purchase the Vehicle.

18      152.    Plaintiffs reasonably relied on Defendant's representations related to the transmission

19  being "automatic" and providing a smooth ride, because Ford was the manufacturer of the vehicle

20  and claimed to have performed and relied upon extensive pre-release testing of the PowerShift

21  Transmission.  Ford was in a superior position of knowledge.

22      153.    Plaintiffs were harmed by purchasing a vehicle that Plaintiffs would not have purchased

23  had they known the true facts about the transmission, and the Transmission Defects, affecting it.

24      154.    Plaintiffs' reliance on Defendants' representations about the transmission qualities was

25  a substantial factor in Plaintiffs' harm, as Ford and its agents were the exclusive source of

26  information about the qualities of the transmission.

27  ///

28  ///

**FIFTH CAUSE OF ACTION**

**Fraudulent Inducement – Negligent Misrepresentation**

**(Against Ford Only)**

155.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

156.    At the time Ford made the misrepresentations identified in paragraph 13-69 above, they had no reasonable grounds for believing the representations to be true, because Ford was simultaneously issuing internal memoranda to its agents and dealerships about the characteristics of the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving." None of those characteristics can be reasonably construed to provide "great handling on all roads," "seamless gear changes," or "amazing responsiveness," as the PowerShift Transmission was described to the Plaintiffs in marketing materials. Ford's knowledge of the Transmission Defect is outlined in more detail in paragraphs 45-52.

**SIXTH CAUSE OF ACTION**

**Negligent Repair**

**(Against Fiesta Ford Only)**

157.    Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

158.    Plaintiff delivered the Subject Vehicle to Defendant Fiesta Ford for repair on numerous occasions.

159.    Fiesta Ford owed a duty to Plaintiff to use ordinary care and skill in storage, preparation and repair of the Subject Vehicle in accordance with industry standards.

160.    Fiesta Ford breached its duty to Plaintiff to use ordinary care and skill by failing to properly store, prepare and repair of the Subject Vehicle in accordance with industry standards.

161.    Fiesta Ford's negligent breach of its duties owed to Plaintiff was a proximate cause of Plaintiff's damages.

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Ford, as follows:

    a.   For general, special and actual damages according to proof at trial;

    b.   For rescission of the purchase contract and restitution of all monies expended;

    c.   For diminution in value;

    d.   For incidental and consequential damages according to proof at trial;

    e.   For civil penalty in the amount of two times Plaintiffs' actual damages;.

    f.   For prejudgment interest at the legal rate;

    g.   For punitive damages pursuant to Civil Code section 3294;

    h.   For reasonable attorney fees and costs of suit; and

    i.   For such other relief as the Court deems just and proper under the circumstances.

Dated: 2/1/18

                                           KNIGHT LAW GROUP, LLP

                                         STEVE MIKHOV (SBN 224676)
                                         Attorney for Plaintiffs,
                                         DARICE A. WIRTH and
                                         EDWARD A. WIRTH

Plaintiffs DARICE A. WIRTH and EDWARD A. WIRTH hereby demand trial by jury in this action.

-28-

Wirth v. Ford - COMPLAINT

# EXHIBIT 1

Customer Completed Copy - 27795328

# CALIFORNIA MOTOR VEHICLE LEASE AGREEMENT

 | FORD CREDIT

www.fordcredit.com
1-800-727-7000

Lease Date: **02/15/2014**

True and Accurate Completed Copy - UCC Non-Authoritative Copy
True and Accurate Completed Copy - UCC Non-Authoritative Copy

**Lessee (and Co-Lessee) - Name and Address (Including County):**

DARICE A WIRTH
81235 AGAVE CT
La Quinta, CA 92253 RIVERSIDE

EDWARD A WIRTH
81235 AGAVE CT
La Quinta, CA 92253 RIVERSIDE

**Lessor - Name and Address:**

FIESTA FORD INC
78 980 VARNER ROAD
INDIO, CA 92203

"Finance Company" is _____ Ford Motor Credit Company _____ . The "Holder" is _____ CAB West LLC _____ and its assigns. By signing "You" (Lessee and Co-Lessee) agree to lease this Vehicle according to the terms in this lease and the terms of the WearCare Addendum if it is attached to this lease.

| New/Used/Demo | Mileage at Delivery | Year/Make/Model | Vehicle ID # | Vehicle Use |
|---|---|---|---|---|
| New | 11 | 2014 Ford Fiesta | 3FADP4EJ0EM203843 | Personal |

**THERE IS NO COOLING OFF PERIOD**
California law does not provide for a "cooling off" or other cancellation period for Vehicle leases. Therefore, You cannot later cancel this lease simply because You change Your mind, decided the Vehicle costs too much, or wish You had acquired a different Vehicle. You may cancel this lease only with the agreement of the Lessor or for legal cause, such as fraud.

**Agreement to Arbitrate:** By signing below You agree that, pursuant to the Arbitration provision on page 6 of this lease, You or we may resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration provision for any additional information concerning the agreement to arbitrate.

Buyer Signs x A *[signature]*

Co-Buyer Signs x A *[signature]*

19002-P-e NOV 13

Page 1 of 7

Customer Completed Copy - 27795328

| 1. Amount Due At Lease Signing or Delivery (Itemized Below) * | 2. Monthly Payments | 3. Other Charges (not part of Your monthly payment) | 4. Total of Payments (The amount You will have paid by the end of the lease) |
|---|---|---|---|
| $ 4,034.44 | Your first monthly payment of $ 284.44 is due on 02/16/2014 , followed by 35 payment of $ 284.44 due on the 17th day of each month. The total of Your monthly payment is $ 10,239.84 | Disposition Fee (if You do not purchase the Vehicle) _____ N/A<br>N/A _____ N/A<br>N/A _____ N/A<br>Total $ _____ N/A | $ 13,889.84 |

## * Itemization of Amount Due at Lease Signing or Delivery

| 5. Amounts Due At Lease Signing or Delivery: | | 6. How the Amount Due at Lease Signing or Delivery will be paid: | |
|---|---|---|---|
| a. Capitalized cost reduction | $ 3,225.23 | a. Net trade-in allowance | $ 0.00 |
| b. First monthly payment | 284.44 | b. Rebates and noncash credits | 1,750.00 |
| c. Refundable security deposit | N/A | c. Amount to be paid in cash | 2,284.44 |
| d. Title fees | N/A | d. N/A | N/A |
| e. Registration fees | 218.00 | | |
| f. California tire fee | 8.75 | Total $ 4,034.44 | |
| g. Acquisition Fee | N/A | | |
| h. Upfront taxes | 258.02 | | |
| i. Electronic Vehicle Registration or Transfer Charge (not a governmental fee) | 20.00 | | |
| j. Document Processing Charge (not a governmental fee) | N/A | | |
| k. N/A | N/A | | |
| l. Smog Abatement Fee | 20.00 | | |
| m. N/A | N/A | | |
| n. N/A | N/A | | |
| o. N/A | N/A | | |
| p. N/A | N/A | | |
| q. N/A | N/A | | |
| r. N/A | N/A | | |
| s. N/A | N/A | | |
| | Total $ 4,034.44 | | |

## 7. Your monthly payment is determined as shown below:

| | |
|---|---|
| a. Gross capitalized cost. The agreed upon value of the Vehicle ($ 20,830.00) and any items You pay over the lease term (such as service contracts, insurance, and any outstanding prior credit or lease balance) (See Item 11)** | $ 22,772.25 |
| b. Capitalized cost reduction. The amount of any net trade-in allowance, rebate, noncash credit, or cash that You pay that reduces the gross capitalized cost. | − 3,225.23 |
| c. Adjusted capitalized cost. The amount used in calculating Your base monthly payment. | = 19,547.02 |
| d. Residual value. The value of the Vehicle at the end of the lease used in calculating Your base monthly payment. | − 11,211.40 |
| e. Depreciation and any amortized amounts. The amount charged for the Vehicle's decline in value through normal use and for other items paid over the lease term. | = 8,335.62 |
| f. Rent charge. The amount charged in addition to the depreciation and any amortized amounts. | + 1,145.70 |
| g. Total of base monthly payments. The depreciation and any amortized amounts plus the rent charge. | = 9,481.32 |
| h. Lease payments. The number of payments in Your lease. | ÷ 36 |
| i. Base monthly payment. | = 263.37 |
| j. Monthly sales / use tax. | + 21.07 |
| k. Total monthly payment. | $ 284.44 |
| l. Lease term in months. | 36 |

**Early Termination. You may have to pay a substantial charge if You end this lease early. The charge may be up to several thousand dollars. The actual charge will depend on when the lease is terminated. The earlier You end the lease the greater this charge is likely to be.**

8. **Excess Wear and Use.** You may be charged for excessive wear based on our standards for normal use. At the scheduled end of this lease, unless You purchase the Vehicle, You must pay to Lessor $0.15 per mile for each mile in excess of 31511 miles shown on the odometer. See Items 21 and 25 and the WearCare Addendum if it is attached to this lease for additional excess wear and use terms.

9. **Extra Mileage Option Credit.** At the scheduled end of this lease, You will receive a credit of $0.NA per unused mile for the number of unused miles between 31511 and 31511 miles, less any amounts You owe under this lease. You will not receive any credit if the Vehicle is destroyed. If You terminate Your lease early, exercise any purchase option, are in default or the credit is less than $1.00.

10. **Purchase Option at End of Lease Term** $ 11,211.40 plus official fees and taxes is Your lease end purchase option price. You have the option to purchase the Vehicle from a party designated by Holder for the purchase option price plus a purchase option fee of $ 500.00 at the end of this lease term if You are not in default.

**Other Important Terms.** See Your lease documents for additional information on early termination, purchase option and maintenance responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable.

16002-P-e NOV 13                                   Page 2 of 7

Customer Completed Copy - 27795328

**11. Itemization of Gross Capitalized Cost**

| Agreed Upon Value of the Vehicle As Equipped at the Time of Signing the Lease | Agreed Upon Value of ____ N/A Lessor Agrees to Add to the Vehicle After Signing the Lease | Agreed Upon Value of ____ N/A Lessor Agrees to Add to the Vehicle After Signing the Lease | Agreed Upon Value of ____ N/A Lessor Agrees to Add to the Vehicle After Signing the Lease |
|---|---|---|---|
| $ 20,830.00 | + $ N/A | + $ N/A | + $ N/A |
| Agreed Upon Value of ____ N/A Lessor Agrees to Add to the Vehicle After Signing the Lease | Agreed Upon Value of ____ N/A Lessor Agrees to Add to the Vehicle After Signing the Lease | Agreed Upon Value of ____ N/A Lessor Agrees to Add to the Vehicle After Signing the Lease | Agreed Upon Value of ____ N/A Lessor Agrees to Add to the Vehicle After Signing the Lease |
| + $ N/A | + $ N/A | + $ N/A | + $ N/A |

| Sales/Use Tax & Other Applicable Taxes | Title Fees | License & Registration Fees | Lessor Services | Acquisition Fee |
|---|---|---|---|---|
| + $ N/A | + $ N/A | N/A | + $ N/A | + $ 645.00 |

| Document Processing Charge (not a governmental fee) | Outstanding Prior Credit or Lease Balance | WearCare | Agreed Upon Value of ____ N/A | Agreed Upon Value of ____ N/A |
|---|---|---|---|---|
| 80.00 | 1,217.25 | + $ N/A | + $ N/A | + $ N/A |

| Electronic Vehicle Registration or Transfer Charge (not governmental fee) | N/A | N/A | N/A | N/A |
|---|---|---|---|---|
| N/A | + $ N/A | + $ N/A | + $ N/A | + $ N/A |

| N/A | N/A | N/A | N/A | Total Gross Capitalized Cost |
|---|---|---|---|---|
| + $ N/A | + $ N/A | + $ N/A | + $ N/A | = $ 22,772.25 |

**12. WARRANTY** The Vehicle is covered by any warranty indicated below:

[X] Standard new Vehicle warranty provided by the manufacturer or distributor of the Vehicle

[ ] N/A

If the Vehicle is of a type normally used for personal use and the Lessor, or the Vehicle's manufacturer, extends a written warranty or service contract covering the Vehicle within 90 days from the date of this lease, You get implied warranties of merchantability and fitness for a particular purpose covering the Vehicle. Otherwise, You understand and agree that there are no such implied warranties, except as otherwise required by state law.

**13. OFFICIAL FEES AND TAXES $ 1,679.29**
The estimated total amount You will pay for official and license fees, registration, title and taxes over the term of Your lease, whether included with Your monthly payments or assessed otherwise. The actual total of fees and taxes may be higher or lower depending on the tax rates in effect or the value of the leased property at the time a fee or tax is assessed.

**14.** This lease contract was negotiated primarily in the language marked:       x       English
Spanish ____ Chinese ____ Tagalog
Korean ____ Vietnamese ____ Other

**15. LESSOR SERVICES** N/A
(See Item 20)       N/A

**16. LATE PAYMENTS** You will pay a late charge on each payment that is not received within 10 days after it is due. The charge is 7.5% of the full amount of the scheduled payment or $50.00 whichever is less.

**17. VEHICLE INSURANCE MINIMUMS.** You must insure the Vehicle during this lease. This insurance must be acceptable to Finance Company and protect You and Holder with (a) comprehensive fire and theft insurance with a maximum deductible amount of $1,000; and (b) collision and upset insurance with a maximum deductible of $1,000; and (c) automobile liability insurance with minimum limits for bodily injury or death of $ 15,000.00 for any one person and $ 30,000.00 for any one accident, and $ 5,000.00 for property damage.

**18. Description of Vehicle or Other Property Trade-In:** 2000 Ford Taurus       Year/Make/Model or Other Property Description   Agreed Upon Gross Value: $ 500.00
See item 8, for net trade-in allowance

N/A

Trade-In, Turn-In and other Individualized Agreements

By: X B _____      By: X B _____
Lessee                      Co-Lessee

18002-P-e NOV 13       Page 3 of 7

Customer Completed Copy - 27795328

True and Accurate Completed Copy - UCC Non-Authoritative Copy      True and Accurate Completed Copy - UCC Non-Authoritative Copy

Customer Completed Copy - 27795328

## VEHICLE MAINTENANCE, INSURANCE AND USE

**19. VEHICLE USE AND SUBLEASING** You will not use, or permit others to use the Vehicle (a) in violation of any law, (b) contrary to the provisions of any insurance policies covering the Vehicle, (c) outside the state where first titled or registered for more than 30 days without Finance Company's written consent, (d) outside the United States, except for less than 30 days in Canada or Mexico or (e) as a private or public carrier. You will keep this lease and Vehicle free of all liens and encumbrances. You will not assign or sublease any interest in the Vehicle or lease without Finance Company's written consent.

**20. VEHICLE MAINTENANCE AND OPERATING COSTS** Proper Vehicle maintenance is Your responsibility. You must maintain and service the Vehicle at Your own expense, using materials that meet the manufacturer's specifications. This includes following the owner's manual and maintenance schedule, documenting maintenance performed, and making all needed repairs. You are also responsible for all operating costs such as gas and oil. Lessor will provide the service(s), if any, identified in the Lessor Services section under the terms of a separate agreement. The manufacturer will invalidate warranty coverage on parts affected by a failure to maintain the Vehicle as required by the manufacturer. (See Lessor Services, item 15)

**21. DAMAGE REPAIR** You are responsible for repairs of All Damage which are not a result of normal wear and use. These repairs include, but are not limited to, those necessary to return the Vehicle to its pre-accident condition, including repairs to Exterior Sheet Metal, Plastic Components, and to Vehicle Safety Systems, including air bag, seat belt and bumper system components. Replacement of Sheet Metal must be made with Original Equipment Manufacturer Sheet Metal. All other repairs must be made with Original Equipment Manufacturer parts. Discuss this requirement with Your insurance company prior to signing a collision repair estimate or before authorizing any collision repair work.
If You have not had the repairs made before the Vehicle is returned at the scheduled end of this lease, You will pay the estimated costs of such repairs, even if the repairs are not made prior to Holder's sale of the Vehicle.

**22. VEHICLE INSURANCE** If the state in which You title/register the Vehicle establishes or changes the minimum automobile liability insurance limits greater than those listed in Section 17, "Vehicle Insurance Minimums," for bodily injury or death and property damage insurance, You must insure the Vehicle and the Holder at the higher minimum limits established by the state. These amounts may not be sufficient to cover all Your liabilities. You may wish to consult Your insurance advisor about obtaining additional coverage. You will list the loss payee and additional insured as requested by Lessor. You must give Finance Company evidence of this insurance.
You authorize Finance Company, on Your behalf, to receive and endorse checks or drafts, and settle or release any claim under the insurance related to Holder's ownership of the Vehicle. You also assign to Holder any other insurance proceeds related to this lease or Holder's interest in the Vehicle.
If You or Finance Company obtain a refund for amounts paid to third parties for insurance, service contracts, or any other amount paid to a third party included in the Gross Capitalized Cost of this lease, You must pay to the Holder the entire amount of the refund and You authorize the Holder to subtract the refund from the amount You owe under the lease.

**LESSOR IS NOT PROVIDING VEHICLE INSURANCE OR LIABILITY INSURANCE**

If you title/register the Vehicle in, or change the garage location of the Vehicle to a state where Finance Company has established minimum automobile liability insurance limits greater than those listed in this lease for bodily injury or death and property damage insurance, You must insure the Vehicle and the Holder at the higher minimum limits established by Finance Company.

## ENDING YOUR LEASE

**23. TERMINATION** This lease will terminate (end) upon (a) the end of the term of this lease, (b) the return of the Vehicle to Lessor or another place designated by Finance Company, and (c) the payment by You of all amounts owed under this lease. Finance Company may cancel this lease if You default.

**24. RETURN OF VEHICLE** If You do not buy the Vehicle at lease end, You must return it to Lessor unless Finance Company designates another place. Upon return of the Vehicle, You must pay the Disposition Fee shown in this lease in Section 3, "Other Charges." If, upon termination of the lease, You enter into a lease agreement or retail installment contract for a new vehicle which is assigned to or administered by Finance Company, You will not be required to pay the Disposition Fee. If You fail to return the Vehicle, You must continue to pay the monthly payments plus other damages to Finance Company, including amounts payable under default. Payment of these amounts will not allow You to keep the Vehicle.

**25. STANDARDS FOR EXCESS WEAR AND USE** You are responsible for all repairs to the Vehicle that are not the result of normal wear and use. These repairs include, but are not limited to those necessary to repair or replace: (a) Tires which are unmatched, unsafe or have less than 1/8 inch of remaining tread in any place; (b) Electrical or mechanical defects or malfunctions; (c) Glass, Paint, Body Panels, Trim and Grill Work that are broken, mismatched, chipped, scratched, pitted, cracked, or if applicable, dented or rusted; (d) Interior rips, stains, burns, or worn areas; and (e) All Damage which

would be covered by collision or comprehensive insurance whether or not such insurance is actually in force. Replacement of Sheet Metal must be made with Original Equipment Manufacturer Sheet Metal. All other repairs must be made with Original Equipment Manufacturer parts. Your use or repair of the Vehicle must not invalidate any warranty.
If You have not had the repairs made before the Vehicle is returned at the scheduled end of this lease, You will pay the estimated costs of such repairs, even if the repairs are not made prior to Holder's sale of the Vehicle.

**26. ODOMETER STATEMENT** Federal law requires You to complete a statement of the Vehicle's mileage at the end of this lease.

19002-P-e NOV 13                     Page 4 of 7

Customer Completed Copy - 27795328

Customer Completed Copy - 27795328

**27. VOLUNTARY EARLY TERMINATION AND RETURN OF THE VEHICLE** You may terminate this lease early by returning the Vehicle to Lessor, unless Finance Company designates another place, and paying the following: (a) the difference, if any, between the Unpaid Adjusted Capitalized Cost and the Vehicle's Fair Market Wholesale Value, plus (b) all other amounts then due under this lease, plus (c) the Disposition Fee shown in this lease in Section 3, "Other Charges." You will never pay more than the sum of the remaining payments, plus any excess wear and use and mileage charges, and all other amounts then due under this lease.

**VOLUNTARY EARLY TERMINATION AND PURCHASE OF THE VEHICLE** You may purchase the Vehicle from Lessor or a party designated by Holder at any time for a purchase price that cannot exceed the following: (a) past due payments at the time of the purchase, plus (b) all other amounts then due under the lease (except excess wear and use and mileage charges), plus (c) any other charges, including the purchase option fee in Section 10, "Purchase Option at End of Lease Term", connected to the early termination and purchase, plus (d) the Unpaid Adjusted Capitalized Cost. You may also be charged for any taxes and other charges incidental to the sale. Payment of the purchase price will satisfy Your liabilities under this lease.

*Unpaid Adjusted Capitalized Cost* is reduced on each payment due date. It is calculated by reducing the Adjusted Capitalized Cost each month by the difference between the Base Monthly Payment and the part of the Rent Charges earned in that month on an actuarial basis. Rent Charges are earned when due. Lessor or Finance Company will provide You with a written explanation of the actuarial method upon Your request.

*Fair Market Wholesale Value*, at Your option, will be: (a) an amount agreed to by You and Finance Company, or (b) the value which could be realized at the wholesale sale of the Vehicle, as determined by a professional appraisal obtained by You at Your expense from an independent third party agreeable to Finance Company at least 3 days prior to any scheduled sale date of the Vehicle, or (c) if not established by agreement or appraisal, the net amount received by Finance Company, Holder or its designated intermediary upon the sale of the Vehicle at wholesale.

Please contact Finance Company at the telephone number or website listed in this lease if You have any questions regarding terminating Your lease.

## DEFAULT AND LOSS OF VEHICLE

**28. DEFAULT** You will be in default if (a) You fail to make any payment when due, or (b) a bankruptcy petition is filed by or against You, or (c) any governmental authority seizes the Vehicle and does not promptly and unconditionally release the Vehicle to You, or (d) You have provided false or misleading material information when applying for this lease, or (e) You fail to keep any other agreement in this lease.

If You are in default, and You have not exercised Your rights in Section 27, the "VOLUNTARY EARLY TERMINATION" paragraph, Finance Company may cancel this lease, take back the Vehicle and sell it at a public or private sale. You also give Finance Company the right to go on Your property to peacefully retake the Vehicle. Even if Finance Company retakes the Vehicle, You must still pay at once: (a) the difference, if any, between the Unpaid Adjusted Capitalized Cost and the Fair Market Wholesale Value, plus (b) all other amounts then due under this lease. You must also pay all expenses, including reasonable attorney's fees, payable by Finance Company to obtain and hold the Vehicle, collect amounts due and enforce Holder's rights under this lease. You authorize Finance Company to cancel Your insurance and apply any proceeds to Your obligation.

**29. LOSS OR DESTRUCTION OF VEHICLE** If the Vehicle is stolen or destroyed, You will pay to Finance Company: (a) the Unpaid Adjusted Capitalized Cost, plus (b) all other amounts then due under this lease, minus (c) any insurance proceeds received by Finance Company. *See Waiver.* If You had in effect the insurance required under this lease and Finance Company receives the full proceeds, You will pay to Finance Company: (a) any past due monthly lease payments, plus (b) the amount of the applicable insurance deductible, plus (c) all other amounts then due under this lease. Even if the Vehicle is insured, until Finance Company receives the appropriate amount above, You are responsible for the scheduled monthly payments.

## ADDITIONAL INFORMATION

**30. ASSIGNMENT AND ADMINISTRATION** When You and Lessor sign this lease, Lessor will assign it to Holder. Finance Company or a substitute will administer this lease. You must then pay all amounts due under this lease to Finance Company. All payments must be made in U.S. funds.

If Finance Company is not the Holder of this lease, Holder has appointed Finance Company as its agent. As agent for Holder, Finance Company has the power to act on Holder's behalf to administer, enforce, and defend this lease. If Lessor has agreed to repair or maintain the Vehicle, obtain any insurance or perform any other service, You will look only to the Lessor for these services.

**31. TAXES** You will promptly pay all fees, charges, and taxes relating to the lease or Vehicle (except for Lessor's or Holder's income taxes). You will pay these amounts even if they are assessed after lease end.

**32. TITLING** The Vehicle will be titled in the name of Holder. You will register the Vehicle as directed by Finance Company. You will pay all license, title and registration costs.

**33. INDEMNITY** You will indemnify and hold harmless Lessor, Finance Company and Holder and their assigns from any loss or damage to the Vehicle and its contents and from all claims, losses, injuries, expenses and costs related to the use, maintenance, or condition of the Vehicle. You will promptly pay all fines and tickets imposed on the Vehicle or its driver. If You do not pay, You will reimburse Finance Company and pay a $20 administration fee, unless prohibited by law, for every such fine, ticket, or penalty that must be paid on Your behalf.

**34. SECURITY DEPOSIT** Your security deposit may be used by Finance Company to pay all amounts that You fail to pay under this lease. You will not receive any interest, profits or other earnings on Your security deposit(s).

**35. CONSUMER REPORTS:** You authorize Finance Company and Holder to obtain consumer credit reports from consumer reporting agencies (credit bureaus) for any reason and at any time in connection with this lease.

18002-P-e NOV 13

Page 5 of 7

Customer Completed Copy - 27795328

True and Accurate Completed Copy - UCC Non-Authoritative Copy

True and Accurate Completed Copy - UCC Non-Authoritative Copy

Customer Completed Copy - 27795328

**36. SERVICING AND COLLECTION** You agree that Lessor, Finance Company, Holder and their affiliates, agents and service providers may monitor and record telephone calls regarding your account to assure the quality of our service or for other reasons. You also expressly consent and agree that Lessor, Finance Company, Holder and their affiliates, agents and service providers may use written, electronic or verbal means to contact you. This consent includes, but is not limited to, contact by manual calling methods, prerecorded or artificial voice messages, text messages, emails and/or automatic telephone dialing systems. You agree that Lessor, Finance Company, Holder and their affiliates, agents and service providers may use any email address or any telephone number you provide, now or in the future, including a number for a cellular phone or other wireless device, regardless of whether you incur charges as a result.

**37. GENERAL** Except as otherwise provided by the law of the state where You reside, the law that will apply to this lease is the law of the state where the Lessor's place of business is, as set forth in this lease. If that law does not allow any of the agreements in this lease, the ones that are not allowed will be void. The rest of this lease will still be good.

**38. ELECTRONIC RECORDS AND SIGNATURES AND CONVERSION TO PAPER** You agree to use electronic records and electronic signatures to document this lease.  Your electronic signatures will have the same effect as signatures on a paper lease.

There will be one authoritative copy of this lease.  It will be the electronic copy in a document management system the Creditor designates for storing it.

The Creditor may convert that authoritative copy to a paper original. The Creditor will do so by printing one paper copy marked "Original." This paper original will have your electronic signature on it.  It will have the same effect as if you had signed it originally on paper.

---

## READ THIS ARBITRATION PROVISION CAREFULLY AND IN ITS ENTIRETY
## ARBITRATION

Arbitration is a method of resolving any claim, dispute, or controversy (collectively, a "Claim") without filing a lawsuit in court. Either You or Lessor/Finance Company/Holder ("us" or "we") (each, a "Party") may choose at any time, including after a lawsuit is filed, to have your Claim related to this contract decided by arbitration. Neither party waives the right to arbitrate by first filing suit in a court. Claims include but are not limited to the following: 1) Claims in contract, tort, regulatory or otherwise; 2) Claims regarding the interpretation, scope, or validity of this provision, or arbitrability of any issue; 3) Claims between You and us, your/our employees, agents, successors, assigns, subsidiaries, or affiliates; 4) Claims arising out of or relating to your application for credit, this contract, or any resulting transaction or relationship, including that with the dealer, or any such relationship with third parties who do not sign this contract.

**RIGHTS YOU AND WE AGREE TO GIVE UP**
If either You or we choose to arbitrate a Claim, then You and we agree to waive the following rights:
* **RIGHT TO A TRIAL, WHETHER BY A JUDGE OR JURY**
* **RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR A CLASS MEMBER IN ANY CLASS CLAIM YOU MAY  HAVE AGAINST US WHETHER IN COURT OR IN ARBITRATION**
* **BROAD RIGHTS TO DISCOVERY AS ARE AVAILABLE IN A LAWSUIT**
* **RIGHT TO APPEAL THE DECISION OF AN ARBITRATOR**
* **OTHER RIGHTS THAT ARE AVAILABLE IN A LAWSUIT**

**RIGHTS YOU AND WE DO NOT GIVE UP:** If a Claim is arbitrated, You and we will continue to have the following rights, without waiving this arbitration provision as to any Claim: 1) Right to file bankruptcy in court; 2) Right to enforce the ownership interest in the vehicle, whether by repossession or through a court; 3) Right to take legal action to enforce the arbitrator's decision; 4) Right to request that a court review whether the arbitrator exceeded its authority; and 5) Right to seek remedies in small claims court for disputes or claims within that court's jurisdiction.

You or we may choose the American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043 (www.adr. org), or any other organization subject to our approval, to conduct the arbitration. The applicable rules (the "Rules") may be obtained from the selected organization. If there is a conflict between the Rules and this contract, this contract shall govern.  This contract is subject to the Federal Arbitration Act (9 U.S.C. § 1 et seq.). The arbitration decision shall be in writing with a supporting opinion. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.  We will pay your total reasonable arbitration filing, administration, service or case management fee and your arbitrator or hearing fee (collectively "Filing Fee") in excess of $200.00. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. We will pay the whole Filing Fee if we demand arbitration first. Any portion of this arbitration provision that is unenforceable shall be severed, and the remaining provisions shall be enforced. Except, however, if a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this arbitration provision shall be unenforceable. Not withstanding any other provision of this arbitration provision, the validity and scope of the waiver of class action rights shall be decided by the court and not by the arbitrator.

Customer Completed Copy - 27795328

True and Accurate Completed Copy - UCC Non-Authoritative Copy

True and Accurate Completed Copy - UCC Non-Authoritative Copy

Customer Completed Copy - 27795328

## SIGNATURES AND IMPORTANT NOTICES

You specifically waive the right to keep any residence address confidential as granted by Section 1808.21 of the California Vehicle Code.

You have the right to return the Vehicle, and receive a refund of any payments made if the credit application is not approved, unless nonapproval results from an incomplete application or from incorrect information provided by You.

Modification: This lease sets forth all of the agreements of Lessor and You for the lease of the Vehicle. There is no other agreement. Any change in this lease must be in writing and signed by You and Finance Company.

Lessee: DARICE A WIRTH

By: X C _____ Title: _____

Co-Lessee: EDWARD A WIRTH

By: X C _____ Title: _____

**YOU ACKNOWLEDGE THAT YOU HAVE READ AND AGREE TO BE BOUND BY THE ARBITRATION PROVISION IN THIS CONTRACT.**

(1) Do not sign this lease before You read it or if it contains any blank spaces to be filled in; (2) You are entitled to a completely filled in copy of this lease; (3) Warning - Unless a charge is included in this lease for public liability or property damage insurance, payment for that coverage is not provided by this lease.

**NOTICE: You state that You have been given notice of an assignment of this lease by the Lessor to Holder and a filled-in paper copy of this lease at the time You electronically sign it.**

Lessee: DARICE A WIRTH

By: X D _____ Title: _____

Co-Lessee: EDWARD A WIRTH

By: X D _____ Title: _____

Lessor and Lessee are hereby notified that Holder has assigned to QI Exchange, in its capacity as Holder's qualified intermediary, its rights (but not its obligations) with respect to the purchase of this Vehicle and the sale of this Vehicle at lease termination.
Lessor accepts this lease and assigns it to Holder under the terms of the finance or lease plan agreement between Lessor and Finance Company unless otherwise indicated here:

Lessor: FIESTA FORD INC

By: X E _____ Title: finance

Customer Completed Copy - 27795328

**KNIGHT LAW GROUP LLP**
Steve Mikhov (SBN 224676)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorney for Plaintiffs,
DARICE A. WIRTH and
EDWARD A. WIRTH

## SUPERIOR COURT OF CALIFORNIA

### COUNTY OF RIVERSIDE

| | |
|---|---|
| **DARICE A. WIRTH and EDWARD A. WIRTH,**<br><br>Plaintiffs,<br><br>vs.<br><br>**FORD MOTOR COMPANY, a Delaware Corporation; FIESTA FORD, INC., a California Corporation, dba FIESTA FORD; and DOES 1 through 10, inclusive,**<br><br>Defendants. | Case No.:<br><br>Unlimited Jurisdiction<br><br>**DEMAND FOR JURY TRIAL**<br><br>*Assigned for All Purposes to the Honorable*<br><br>Department |

### DEMAND FOR JURY TRIAL

Plaintiffs, DARICE A. WIRTH and EDWARD A. WIRTH, hereby demand trial by jury in this action.

Dated: 7/1/18                              **KNIGHT LAW GROUP, LLP**

                                           _____
                                           STEVE MIKHOV (SBN 224676)
                                           Attorney for Plaintiffs,
                                           DARICE A. WIRTH and
                                           EDWARD A. WIRTH

-1-
**DEMAND FOR JURY TRIAL**

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Steve Mikhov  (SBN 224676)
Knight Law Group, LLP
1801 Century Park East, Suite 2300, Los Angeles, CA 90067
TELEPHONE NO.: (310) 552-2250   FAX NO.: (310) 552-7973
ATTORNEY FOR *(Name):* DARICE A. WIRTH and EDWARD A. WIRTH

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Riverside
STREET ADDRESS: 3255 E. Tahquitz Canyon Way
MAILING ADDRESS: 3255 E. Tahquitz Canyon Way
CITY AND ZIP CODE: Palm Springs, CA 92262
BRANCH NAME: Palm Springs Courthouse

**CASE NAME:**
DARICE A. WIRTH and EDWARD A. WIRTH v. FORD MOTOR COMPANY, a Delaware Corporation, et al.

FOR COURT USE ONLY

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) □ Limited (Amount demanded is $25,000 or less) | □ Counter  □ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | PSC 1 8 0 0 6 6 8 |
| | | JUDGE: |
| | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
□ Auto (22)
□ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
□ Asbestos (04)
□ Product liability (24)
□ Medical malpractice (45)
□ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
□ Business tort/unfair business practice (07)
□ Civil rights (08)
□ Defamation (13)
□ Fraud (16)
□ Intellectual property (19)
□ Professional negligence (25)
□ Other non-PI/PD/WD tort (35)

**Employment**
□ Wrongful termination (36)
□ Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
□ Rule 3.740 collections (09)
□ Other collections (09)
□ Insurance coverage (18)
□ Other contract (37)

**Real Property**
□ Eminent domain/Inverse condemnation (14)
□ Wrongful eviction (33)
□ Other real property (26)

**Unlawful Detainer**
□ Commercial (31)
□ Residential (32)
□ Drugs (38)

**Judicial Review**
□ Asset forfeiture (05)
□ Petition re: arbitration award (11)
□ Writ of mandate (02)
□ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
□ Antitrust/Trade regulation (03)
□ Construction defect (10)
□ Mass tort (40)
□ Securities litigation (28)
□ Environmental/Toxic tort (30)
□ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
□ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
□ RICO (27)
□ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
□ Partnership and corporate governance (21)
□ Other petition *(not specified above)* (43)

2. This case □ is  [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. □ Large number of separately represented parties
  b. □ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
  c. □ Substantial amount of documentary evidence
  d. □ Large number of witnesses
  e. □ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
  f. □ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary   b. □ nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action *(specify):* 6
5. This case □ is  [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 2/1/18

Steve Mikhov
(TYPE OR PRINT NAME)                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*

**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or*
    *toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil*
    *harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer*
      *or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
      *domain, landlord/tenant, or*
      *foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex*
    *case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-*
      *domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified*
    *above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-*
      *harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified*
    *above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

| | |
|---|---|
| ☐ BANNING 135 N. Alessandro Rd., Banning, CA 92220 | ☐ MURRIETA 30755-D Auld Rd., Suite 1226, Murrieta, CA 92563 |
| ☐ BLYTHE 265 N. Broadway, Blythe, CA 92225 | ☒ PALM SPRINGS  3255 E. Tahquitz Canyon Way, Palm Springs, CA 92262 |
| ☐ HEMET 880 N. State St., Hemet, CA 92543 | ☐ RIVERSIDE 4050 Main St., Riverside, CA 92501 |
| ☐ MORENO VALLEY 13800 Heacock St., Ste. D201, Moreno Valley, CA 92553 | ☐ TEMECULA 41002 County Center Dr., #100, Temecula, CA 92591 |

RI-030

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar Number and Address)
Steve Mikhov (SBN 224676)
Knight Law Group, LLP
1801 Century Park East, Suite 2300
Los Angeles, CA  90067
TELEPHONE NO: (310) 552-2250          FAX NO. (Optional): (310) 552-7973
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): DARICE A. WIRTH and EDWARD A. WIRTH

PLAINTIFF/PETITIONER: DARICE A. WIRTH and EDWARD A. WIRTH

DEFENDANT/RESPONDENT: FORD MOTOR COMPANY, et al.

FOR COURT USE ONLY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FEB 0 2 2018

K. Boldis

CASE NUMBER:
PSC 1 8 0 0 6 6 8

CERTIFICATE OF COUNSEL

The undersigned certifies that this matter should be tried or heard in the court identified above for the reasons specified below:

☐   The action arose in the zip code of: _____

☐   The action concerns real property located in the zip code of: _____

☒   The Defendant resides in the zip code of: 92203 _____

For more information on where actions should be filed in the Riverside County Superior Courts, please refer to Local Rule 1.0015 at www.riverside.courts.ca.gov.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date  2/1/18

Steve Mikhov
[TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION]          ► _____ (SIGNATURE)

Approved for Optional Use
Riverside Superior Court
RI-030 [Rev. 09/16/10]          CERTIFICATE OF COUNSEL          Page 1 of 1
Local Rule 1.0015
riverside.courts.ca.gov/localrules/localrules.shtml

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
3255 E. Tahquitz Cyn Way
Palm Springs, CA 92262
www.riverside.courts.ca.gov

NOTICE OF DEPARTMENT ASSIGNMENT FOR ALL PURPOSES

WIRTH VS FORD MOTOR COMPANY

CASE NO. PSC1800668

This case is assigned to the Honorable Judge David M. Chapman   in Department PS2
for all purposes.
The   Case Management Conference is scheduled for 08/01/18 at   8:30 in Department

The   plaintiff/cross-complainant   shall   serve   a   copy   of   this   notice   on   all
defendants/cross-defendants who are named or added to the complaint and file proof of
service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that
section. The court follows California Rules of Court, Rule 3.1308(a) (1) for tentative
rulings (see Riverside Superior Court Local Rule 3316). Tentative Rulings for each law
and motion matter are posted on the Internet by 3:00 pm on the court day immediately
before the hearing at <http://www.riverside.courts.ca.gov/tentativerulings.shtml>. If you
do not have internet access, you may obtain the tentative ruling by telephone at
(760)904-5722.

To request oral argument, not later than 4:30 pm on the court day before the hearing you
must (1) notify the judicial secretary at (760)904-5722 and (2) inform all other parties. If
no request for oral argument is made by 4:30 pm, the tentative ruling will become the
final ruling on the matter effective the date of the hearing.

Requests for accommodations can be made by submitting Judicial Council form MC-410
no fewer than five court days before the hearing. See California Rules of Court, rule

CERTIFICATE OF MAILING

I certify that I am currently employed by the Superior Court of California, County of
Riverside, and that I am not a party to this action or proceeding. In my capacity, I am
familiar with the practices and procedures used in connection with the mailing of
correspondence. Such correspondence is deposited in the outgoing mail of the Superior
Court. Outgoing mail is delivered to and mailed by the United States Postal Service,
postage prepaid, the same day in the ordinary course of business. I certify that I served
a copy of the foregoing NOTICE on this date, by depositing said copy as stated above.

Court Executive Officer/Clerk

Date: 02/02/18

by:  K. Boldis
KRISZTIAN I BOLDIS, Deputy Clerk

cdacmc
6/30/17